UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
07-CV-255(JMR/FLN)

Kevin Loye, Gina Gist,               )
Vikki Marshall, and David Stiles     )
                                     )
        v.                           )          ORDER
                                     )
County of Dakota                     )


An  environmental  emergency  occurred  in  Dakota  County,

Minnesota.  Dakota County responded.  As a result, the County is a

defendant  in  this  lawsuit.   One  is  reminded  that  it  takes  very

little to turn a simple problem into a "federal case."  Ultimately,

however,  it  is  also  a  reminder  that  not  all  federal  cases  are

meritorious.

    Defendant moves for summary judgment.  The motion is granted.

I.  <u>Background</u>[1]

    On  Labor  Day,  September  6,  2004,  two  children  broke  into  an

abandoned building in the City of Rosemount, Minnesota ("the City"

or  "Rosemount").   The  break-in  occurred  near  Rosemount  Woods,  a

mobile  home  park.    Rosemount  is  located  in  Dakota  County,

Minnesota.

    The children found and stole two bottles of mercury apparently

abandoned  in  the  building.   They  took  the  mercury  to  a  nearby

playground.  A neighbor saw the activity in the park and called the

police,  who  responded,  recognizing  mercury  as  a  hazardous

---

[1]  The  Court  considers  the  facts  most  favorably  to  the
plaintiffs, as non-moving parties.

substance.

Dakota County's first responders were prepared for such an event, their preparations having begun, a year before, in September 2003. At that time, Dakota County and eleven of its municipalities executed a joint powers agreement. They agreed to create the Dakota County Domestic Preparedness Committee. The Committee and its public entities collectively plan for, and respond to, emergencies and large-scale community disasters.

Putting their training into operation, police officers began knocking on doors to find and quarantine people who might have been exposed to the mercury. When officers knocked on the door of plaintiff Vikki Marshall, she told them she was deaf and asked for an interpreter. Because no interpreter was present, the officers could not comply. All of the plaintiffs and their families were exposed to the mercury. Over the course of the evening, plaintiffs - all of whom are deaf - requested interpreters at least four times, without success.

During the evening, the City requested assistance from other agencies, including the Minnesota Pollution Control Agency, the United States Environmental Protection Agency, the Minnesota Department of Health, and Regions Medical Center. At about 9:00 p.m., the City also requested assistance from the Dakota County

Special Operations Team ("SOT").[2]  Upon their arrival, the Rosemount Fire Department Incident Commander placed the SOT in charge of decontamination.  Shortly after 11:00 p.m., the SOT, assisted by the Inver Grove Heights Fire Department,[3] began decontamination operations.

The SOT set up a decontamination tent, which housed a shower to remove or neutralize the mercury contamination.  Decontamination team members stood at the beginning of the line leading to the tent.  They orally instructed residents to remove all their clothing, eyeglasses, and jewelry.  These items were to be collected and labeled.  Those exposed to the mercury would undergo successive washings, after which they would be clothed in a Tyvek suit.  (Pott Dep. 70.)  Jeff Beaman, Marshall's live-in boyfriend, is a hearing person.  He accompanied Ms. Marshall in line and heard the instructions.  Marshall can lip read, but lip reading was complicated by darkness and the masks worn by many decontamination team members.

---

[2]  The Dakota County Domestic Preparedness Committee established the SOT to conduct rescue operations and serve as a crisis resource for local fire and law enforcement agencies.  Its members are specially trained law enforcement, fire, and emergency services workers employed by Dakota County or one of the other parties to the joint powers agreement.  The SOT is not, itself, a first responder organization.

[3]  For convenience, the Court refers to those conducting the decontamination - whether individual members of the SOT or members of the Inver Grove Heights Fire Department - as the "decontamination team."

Marshall and her daughter, Cassie, then 8 years old, were the first to be decontaminated. The children "playing" with the stolen mercury poured some over Cassie's head, making her among the most severely contaminated. Because there was no interpreter, and he did not know American Sign Language, a fireman gestured to Marshall, her daughter, and the rest of the family to get them into the decontamination tent.

As plaintiffs passed through the line, the decontamination team attempted to communicate by speaking to their hearing family members, and by pointing and gesturing, directing them where to go and what to do. It was now well past 11:00 p.m.; no interpreter was present, although plaintiffs had requested one.

Plaintiffs complied with the decontamination team's hand gestures, removing their clothing, surrendering their personal items, and submitting to cold water spray rinses and brush scrubs. After the spray-wash, decontaminated individuals received white Tyvek suits. There were not enough Tyvek suits to clothe all of those who had been decontaminated. Plaintiffs Loye and Gist and their three-year-old son were last in line. They received blankets for cover. None of the evacuees – hearing or deaf – were permitted to return home. They were, instead, taken by bus to a nearby AmericInn Motel which the Red Cross secured as an emergency

shelter.[4]

These experiences – undoubtedly frightening and disorienting to all who were contaminated – were particularly difficult for the deaf plaintiffs. They found it hard to get information and, lacking information, found it even harder to reassure their children.[5]

Forty-nine people were decontaminated, including the plaintiffs. The last decontamination was completed shortly before 2:00 a.m., on September 7. After treating the contaminated individuals and taking them to the emergency shelter, the decontamination team turned its attention to their residences. Twelve mobile homes, including Marshall's, Loye's, and Gist's, were declared public health nuisances due to high levels of mercury. The Minnesota Pollution Control Agency began contamination abatement, which continued over the next few days.

Dakota County became directly involved in the response effort on September 7, when its Department of Public Health ("Public Health") assumed responsibility for the evacuees' health and housing needs. During the evening of September 7, barely 24 hours

---

[4] Marshall and Beaman were permitted to take Cassie to the emergency room at Regions Hospital where she was examined.

[5] Marshall states she wanted to ask why simply washing Cassie's hair was not sufficient. She also wanted to tell decontamination team members to be careful of her own recent-surgical scar. Gist states she wanted to ask what was going on and what would happen to her clothes.

after the mercury theft, the City held an evacuees' meeting at the emergency shelter. An American Sign Language ("ASL") interpreter was present. Plaintiffs maintain they were not told about the meeting, and therefore, did not attend.

Over the next week, Public Health and other responding entities conducted several community meetings for evacuees. The meetings were designed to update and explain the home decontamination process, provide counseling, and answer questions. ASL interpreters were provided for most, if not all, of these meetings. Marshall complains that at two of the meetings she had communication difficulties, even though an interpreter was present. She contends it was difficult to get her questions answered, because the interpreter worked exclusively with plaintiffs Loye and Gist.

On September 8, Public Health officials met to plan and assign follow-up tasks related to the evacuees' health and housing needs. A Public Health nurse was assigned to each displaced household. Nurse Gerilee Greeley was assigned to plaintiffs' households and was told she would be working with several deaf individuals.

Beginning on September 8, plaintiffs met individually or in family groups with Nurse Greeley. Loye and Gist had an interpreter for their initial meeting with Greeley; Marshall claims she did not. After assessing plaintiffs' medical needs and their communication preferences and abilities, Greeley decided she could

communicate effectively with plaintiffs without an interpreter. The parties dispute whether plaintiffs asked for an interpreter or consented to alternative means of communication.

Plaintiff David Stiles, a guest of plaintiffs Marshall and Beaman, returned to his home in Shakopee on September 9, 2004, three days after the mercury incident. Marshall and Beaman returned to their home the same day. Loye and Gist, whose home was among the worst contaminated, could not return until September 23. Nurse Greeley continued to assist plaintiffs through the end of September 2004.

A year later, in September 2005, plaintiffs filed charges with the Minnesota Department of Human Rights. They claimed that, during the decontamination period, Dakota County Public Health Services failed to provide interpreters, violating the Minnesota Human Rights Act, Minn. Stat § 363A.12. The Commissioner dismissed the charges on December 7, 2006. This action was filed on January 19, 2007. Defendant now moves for summary judgment.

II. <u>Analysis</u>[6]

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. Fed. R. Civ. P. 56; <u>Celotex Corp.</u>

---

[6] The Court assumes, without deciding, plaintiffs possess Article III standing. Accordingly, it has not considered plaintiffs' supplemental memorandum on that subject. [Docket No. 60.]

v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49.

Plaintiffs allege violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"),[7] Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("RA"),[8] and the Minnesota Human Rights Act, Minn. Stat. § 363A.12, subd. 1 ("MHRA").[9] Each statute prohibits discrimination on the basis of disability. For analytic purposes, each is identical. See Randolph v. Rogers, 170 F.3d 850, 858 (8th Cir. 1999) (ADA and RA); Somers v. City of

---

[7] Title II of the ADA states, in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

[8] Under § 504 of the Rehabilitation Act, no otherwise qualified individual with a disability shall be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

[9] The Minnesota Human Rights Act provides, in relevant part: "It is an unfair discriminatory practice to discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of . . . disability . . . or to fail to ensure physical and program access for disabled persons unless the public service can demonstrate that providing the access would impose an undue hardship on its operation."

<u>Minneapolis</u>, 245 F.3d 782, 788 (8th Cir. 2001) (ADA and MHRA).

Plaintiffs, who would state a prima facie case under any of the statutes, must show (1) they are qualified individuals with a disability; (2) they were denied the benefits of a public entity's service or program, or otherwise discriminated against; and (3) the denial or discrimination was based on their disability.[10] <u>Randolph</u>, 170 F.3d at 858.

Defendant acknowledges it is a public entity and plaintiffs are qualified individuals with disabilities. The County, however, denies plaintiffs have shown a triable issue as to elements 2 and 3, resulting in a failure of their prima facie case. To survive summary judgment, therefore, plaintiffs must come forward with facts from which a jury could find Dakota County denied them the benefit of its services, or otherwise discriminated against them, because they are deaf.[11]

A disabled individual is denied the benefit of a public entity's programs, activities, or services when he or she does not receive "meaningful access" to those services. <u>Id.</u> Limited

---

[10] The Rehabilitation Act adds an additional requirement: the program or activity from which the plaintiff was excluded must receive federal financial assistance. <u>Randolph</u>, 170 F.3d at 858. Defendants have not challenged plaintiffs' ability to establish this element.

[11] The ADA permits an affirmative defense that the requested modification is unduly burdensome. <u>Randolph</u>, 170 F.3d at 858. Because the County did not advance this defense, it is not considered.

participation in such services is not equivalent to "meaningful access." Id.

The federal regulations illuminate Title II, and illustrate those services public entities must provide to assure meaningful access.[12] Public entities must "take appropriate steps to ensure that communications" with deaf persons are "as effective as communications with others." 28 C.F.R. § 35.160(a). Such steps may include furnishing "appropriate auxiliary aids and services." 28 C.F.R. § 35.160(b)(1). For deaf persons, these include:

> Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. § 35.104(1). A "qualified interpreter" is "able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary." Id.

When providing auxiliary aids or services, the public entity must give "primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2). The Eighth Circuit has also recognized, however, that giving "primary consideration" does not mean a public entity must always supply exactly what is

---

[12] The Eighth Circuit Court of Appeals considers Title II's regulations "instructive" when interpreting the ADA and the RA. See Gorman v. Bartch, 152 F.3d 907, 913 (8th Cir. 1998).

requested.  See Petersen v. Hastings Public Schools, 31 F.3d 705, 708-09 (8th Cir. 1994).  The question is whether there has been effective communication.  Id. at 709.

Effective communication must be considered in context.  The cases construing these regulations make clear that auxiliary aids appropriate in one context, may not be considered effective in another.  28 C.F.R. Pt. 35, Appendix A, commenting on Section 35.160; Chisholm v. McManimon, 275 F.3d 315, 326 (3d Cir. 2001).

As stated by the Eleventh Circuit:

> [i]n many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication.  In other circumstances, an interpreter will be needed.  There is no bright-line rule, and the inquiry is highly fact-specific.

Bircoll v. Miami-Dade County, 480 F.3d 1072, 1087 (11th Cir. 2007).  If the facts clearly show effective communication, there is no need for a trial and summary judgment is proper.  Id. at 1088 (affirming grant of summary judgment for defendant).

Title II also prohibits public entities from discriminating against disabled individuals based on their disability.  There must be "reasonable modifications in policies, practices, or procedures" to avoid discrimination, unless "making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  The adequacy of these "reasonable modifications" is highly fact-specific.  Bircoll, 480 F.3d at 1086.

Accordingly, the Court considers whether plaintiffs received effective communication during the response to the Rosemount mercury incident, and if not, whether their requested modification - providing an ASL interpreter - was reasonable at the time. The Court considers these elements in the context of the developing events.

1. The Decontamination[13]

These events began on Labor Day, Monday, September 6, 2004, at the end of the three-day weekend. The boys began "playing" with their stolen mercury in the afternoon. Organized decontamination began at approximately 11:00 p.m. that night - a time when no ASL interpreters were present.

The Court finds exigent circumstances existed the night of September 6-7. This was an extreme environmental and personal health emergency occurring in real time. Individuals - including plaintiffs - had been directly exposed to a dangerous environmental contaminant, capable of causing long-lasting or permanent effects.

Neither the statutes before this Court, the law, or logic, require a delay in protecting the public or in ameliorating such a danger. To require that an ASL interpreter be present under these

---

[13] Dakota County questions whether it is legally responsible for immediate decontamination procedures at all, arguing the procedures were conducted by the SOT, a separate legal entity. Plaintiffs reply that the County effectively controls the SOT, and may be liable for actions of joint powers parties. The Court need not resolve this dispute, as it finds there was no violation of the ADA, the RA, or the MHRA.

emergency conditions would be equivalent to requiring that every fire truck be equipped with a full-time interpreter, lest it come upon a burning home with deaf and sleeping residents, and then be faced with a civil rights lawsuit for attempting a rescue by breaking down the door in the absence of an interpreter. It is similarly unavailing to argue that either this decontamination team, or the hypothetical firefighter, ought to keep an ASL interpreter on hand 24 hours a day, 365 days a year, to guard against such a possibility. Neither the words nor the intent of these statutes impose such a requirement.

The Court does not question or doubt the terrors of that night. But when these first responders made their hand gestures, the information they conveyed was brief and simple: Come here. Remove your clothes. Put your items in the bag. Go over there.

The communications were effective. Plaintiffs, themselves, testified they followed these directions. Their ability to absorb and comply with these directions shows the messages were conveyed and received. See Bircoll, 480 F.3d at 1086 (suspect's compliance with field sobriety tests showed communication was effective). Taking plaintiffs' evidence in the strongest light, it shows that hearing persons had - at most - a few more minutes' notice of what would happen in the decontamination process. Under these middle-of-the-night emergency circumstances, any failure to provide an interpreter does not rise to the level of a violation of law.

While imperfect, the gestures, pointing, and oral communications with hearing family members were "not so ineffective that an [ASL] interpreter was necessary to guarantee that [plaintiffs] were on equal footing with hearing individuals." Bircoll, id. Plaintiffs may have wanted to ask questions, but there is no evidence that anyone – deaf or hearing – would have been permitted to ask questions under these circumstances.

While the Eighth Circuit Court of Appeals has not spoken to the issue, other Circuits have found exigent circumstances are a consideration when deciding whether reasonable modifications were in place. "Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence." Waller v. City of Danville, 556 F.3d 171, 175 (4th Cir. 2009) (ADA did not require police to contact mentally ill suspect's family or mental health professionals during two-hour hostage standoff); see also Tucker v. Tennessee, 539 F.3d 526, 536 (6th Cir. 2008) (ADA did not require police to obtain an interpreter before arresting deaf persons involved in assault); Bircoll, 480 F.3d at 1086 (ADA did not require police to obtain an interpreter before administering roadside field sobriety tests).

The emergency responders' first duty was to secure the area and protect public health and safety. Any delay increased the risk to these individuals, and the community at large. In such exigent

circumstances, the Court finds it is not reasonable to wait[14] for an interpreter. See Bircoll, 480 F.3d at 1086.

Plaintiffs bring their claims pursuant to statutes. But even Constitutional protections stand aside in the face of exigent circumstances. See, e.g., Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (exigent circumstances render warrantless entry into home objectively reasonable under Fourth Amendment); United States v. Banks, 540 U.S. 31, 37 (2003) (same, for forcible entry on "knock-and-announce" warrant). In such cases, "[t]he need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency." Brigham City, id. (internal quotations omitted).

Faced with the occurrences on the night of the incident, the absence of an interpreter during the emergency midnight

---

[14] According to plaintiffs, "[i]nterpreter provider agencies could have provided an interpreter" in the four hour period between Marshall's first request and the start of decontamination operations. (Pl. Mem. at 19.) This conclusion finds no support in the record. Assuming their testimony would be admissible at trial, plaintiffs' experts utterly fail to show that defendants could have obtained the services of a qualified ASL interpreter on short notice on the last night of a holiday weekend. One expert contends that one of the Twin Cities' three 24-hour interpreter agencies "might have been able to provide interpreters if they had been contacted on the evening of the incident, and more than likely would have been able to provide interpreters on the subsequent days." (Expert Witness Report of Marty Barnum at 10.) Dakota County had no 24-hour interpreter contract in place. (Id.) Even if it had, plaintiffs' other expert claims there is no guarantee a 24-hour interpreter agency could have actually supplied an interpreter. (Expert Witness Report of Trudy Suggs at 5, 15.)

decontamination did not violate plaintiffs' rights under the ADA, the RA, or the MHRA.  The Court finds plaintiffs received effective communication; no reasonable jury could find to the contrary.

### 2. Large Group Meetings

Whether or not an interpreter is needed in any particular situation is also fact-specific.  Bircoll, 480 F.3d at 1087.  The County need not "employ any and all means" to make auxiliary aids available, but must make "reasonable modifications."  Bircoll, 480 F.3d at 1082 (citing Tennessee v. Lane, 541 U.S. 509, 531-32 (2004)).  As the United States Supreme Court has recognized, "meaningful access" strikes a balance between "two powerful but countervailing considerations - the need to give effect to the statutory objectives and the desire to keep [the statutes] within manageable bounds."  Alexander v. Choate, 469 U.S. 287, 298 (1985) (interpreting the Rehabilitation Act).

Applying these principles, the Court considers the meeting series as a whole, and finds plaintiffs received effective communication.  All parties agree:  Dakota County provided ASL interpreters at most[15] of the large group meetings.  Only Marshall claims that meetings occurred without an interpreter.  She denies the presence of an interpreter at two meetings, but has not testified consistently in this regard.

_____

[15] The County has produced interpreter invoices showing attendance at all large group meetings.  (Keena Aff. Ex. 33.)

Marshall claims no interpreter attended a meeting in the lobby
of the AmericInn purportedly occurring the morning September 8,
2006.  No other witness, however, recalls this meeting, and the
County has no record of it.  Plaintiffs offer no evidence other
than Marshall's recall of any such meeting.  There is no evidence
of what was discussed, or which, if any, County employees were
present.[16]  On these facts, no jury could find the County deprived
Marshall of effective communication at this meeting because she was
deaf.

Marshall makes similar claims about a September 10 meeting at
the Eagan Community Center.  (Marshall Dep. at 120).  Yet her
testimony denying an interpreter's presence is contradicted not
only by her own later-filed affidavit, but also by Loye.  (See
Marshall Aff., Ex. A; Loye Dep. at 166.)  From this inconsistent
and contradictory evidence, no reasonable jury could find the
County failed to provide an interpreter at the September 10
meeting.

Finally, Marshall denies an interpreter attended a meeting at
the Rosemount Fire Station on September 15.  (Marshall Dep. 124,
Marshall Aff. ¶ 6 and Ex. A.)  Here, she testified she was told an
interpreter was coming, but she "gave up" waiting and decided to

_____

[16] If the County is correct and there was no meeting, there
was, perforce, no subject.  Plaintiffs allude to pages 99-107 of
Marshall's deposition.  (Pl. Mem. at 10.)  They have, however,
provided only page 100, as well as Marshall's affidavit, neither of
which shed any light on what occurred at this meeting.

leave before the interpreter arrived. (Marshall Dep. 124-25.) The County's evidence shows an interpreter was present. Again, no reasonable jury could find from this evidence that the County failed to provide an interpreter at the September 15 meeting.

Even if the Court were to assume Marshall is correct and no interpreters were provided at these three group meetings, the Court would find no violation of the statutes. The Supreme Court's balance between effecting the statutory objectives and maintaining manageable bounds, see Alexander, 469 U.S. at 298, reasonably means not every event can be interpreted in real time. There must, however, be effective communication and, when needed, reasonable modifications. As already noted, these are fact-specific inquiries. If no interpreter was present at a particular meeting, the Court finds it a reasonable modification to afford deaf plaintiffs an opportunity to learn the information presented at the meeting and ask questions within a reasonable time.

This is exactly what happened here. On September 8, Public Health employee Jon Springsted was at the AmericInn in advance of a large group meeting scheduled for that afternoon.[17] Marshall asked him for an ASL interpreter, which Springsted obtained for the afternoon group meeting. He also arranged an ASL-interpreted

---

[17] It seems possible that this individual conversation may have been the "public meeting" Ms. Marshall claims was not interpreted. If so, there was no statutory violation: she asked for an interpreter, and one attended the afternoon meeting.

private meeting afterward for deaf evacuees, to assure everyone had an opportunity to ask questions. If Marshall had questions about what had happened at the morning meeting, she had an opportunity to ask later that day. This is effective communication; providing interpreters at subsequent meetings and arranging for a private meeting within a reasonable time were reasonable modifications.

Marshall also claims that, on the afternoon of September 8 and again on September 15 -- both times when an interpreter was provided -- she did not always receive effective communication. Here she claims the interpreter worked exclusively with Loye and Gist. Even if true, these facts do not establish a prima facie case of a statutory violation. The County provided one interpreter to assist a handful of deaf individuals. Providing additional interpreters is not reasonable. Nothing in the law requires that each deaf person be afforded their own interpreter. The Court will not impose such an obligation.

Marshall's testimony, if believed, tends to show Loye and Gist may have monopolized the interpreter's attention, and rather than intervene, Marshall acquiesced. Nothing, and certainly no act by the County, prevented Marshall from asking the interpreter to assist her. But she did not. If there was any extent to which the interpreter favored Loye and Gist over Marshall, that cannot be considered the County's civil rights violation.

On these facts, the County provided effective communication

and reasonable modifications.  Marshall got the interpreter she sought for the large meeting on September 8.  She may not have been pleased with the interpreter's performance on September 8 or 10, and may not have wanted to wait for the interpreter's arrival on September 15.  She may not have been satisfied; but the statutes' requirements were.

Plaintiffs insist an interpreter is mandated for every meeting.  They are incorrect.  While always desirable, the Court declines to hold an interpreter must absolutely be provided for every meeting, regardless of circumstances.  The question remains: did plaintiffs receive effective communication?  Plaintiffs identify no information they missed, nor any harm suffered as a result of any alleged failure to provide interpreters.  See Mason v. Correctional Medical Services, 559 F.3d 880, 888 (8th Cir. 2009) (affirming summary judgment for defendant where plaintiff could not explain how the requested modification was superior to the modification provided by defendant).  On these facts, plaintiffs have shown no intentional or systematic denial of interpreter services.

Granting plaintiffs every disputed fact, the Court finds – concerning public meetings – Dakota County provided reasonable and effective communication.  Accordingly, summary judgment in favor of the County is proper as to these claims.

3.   <u>Visits by Public Health Nurse</u>

Dakota County first denies that many of Nurse Greeley's contacts were statutorily-defined "services."  It argues she provided services "well beyond the scope of her duties," because they involved non-medical assistance.  (Def. Amended Mem. at 22). The Court rejects this defense.  Under Title II's regulations, the ADA extends to "all services, programs, and activities provided or made available by public entities."  28 C.F.R. § 35.102(a); <u>Yeskey v. Pennsylvania Dep't of Corrections</u>, 118 F.3d 168, 171 (3d Cir. 1997), <u>aff'd</u>, 524 U.S. 206 (1998).  A public entity is obliged to provide effective communications for the disabled, even if the topics covered fall beyond an employee's immediate duties.

Indeed, on these facts, the Court cannot find Nurse Greeley acted outside her authority.  The Dakota County Department of Health, a public entity, sent Public Health nurses to communicate with displaced County residents on a one-on-one basis.  Nurse Greeley contacted plaintiffs over several weeks helping them resolve both medical and non-medical issues arising from the mercury release.  She kept detailed notes of her communications, regardless of topic.  Her progress notes show both medical and non-medical issues within the same conversation. (Greeley Dep. Ex. 2.) There is nothing to show the County ever attempted to limit her communications to purely medical issues.  As a result, the Court rejects its contention that her communications touching medical

issues were "services," while those dealing with other topics were not.  The nurse's contacts with the plaintiffs are covered by the ADA, the RA, and the MHRA.

At the same time, the Court rejects plaintiffs' suggestion that, having provided ASL interpreters at large group meetings, the County was bound to provide them for every future contact, including every one-on-one contact.  (Pl. Mem. 24, n. 12.)  The statutes and cases do not support this view.  As before, the questions remain:  were the communication methods chosen by Nurse Greeley effective?  If not, was providing an ASL interpreter a reasonable modification?

a.  Nurse Contacts With Loye And Gist

Loye and Gist initially met with Greeley on September 8.  They were assisted by an ASL interpreter during most of that meeting. They claim they had difficulty communicating once the interpreter left, yet apparently said nothing to Greeley about their concerns. During the meeting, Greeley assessed their ability to communicate with her and decided "we could use sign language interpreters if it was needed depending on what we needed to discuss."  (Greeley Dep. at 46.)  Loye told Greeley he did not have his blood pressure medication.  She brought the required medication to the group meeting later that same day.  She told him he needed to see his doctor before getting the prescription refilled.  (Id. 51, 54.) There is no evidence suggesting he did not receive or understand

this information.

Greeley met briefly with Loye and Gist the next morning. The parties dispute whether an interpreter was present. No medical issues were discussed. This meeting focused on the family's imminent relocation to temporary housing. Greeley gave them directions to their new home, and at their request, called Gist's mother to notify her of their new address and phone number. (Loye Aff. Ex. A; Greeley Dep. Ex. 2 at 1-2.)

On September 10, Greeley met Loye and Gist at the Eagan Community Center. An interpreter was present. No medical issues were discussed. Greeley noted they had reclaimed their van, recovered some personal property, and planned to attend a group counseling session the next day. Greeley said she would provide a resource list including phone numbers for a food shelf and instructions on applying for food stamps. This was the last time Greeley used an interpreter in communicating with Loye and Gist.

A day or two later, Greeley met with Loye and Gist at their temporary home. (Loye Aff. Ex. A at 2; Greeley Dep. Ex. 2.) She opted against bringing an interpreter because she "was just checking in with people to see how they were doing." By this time she knew Loye and Gist had no medical needs related to the mercury incident. (Greeley Dep. at 71.) She gave them copies of a community resource booklet focused on financial and transportation issues, communicating by means of written questions and answers.

(Id., and Ex. 2.)  Loye had previously used written notes to communicate at his job and in the neighborhood.  (Loye Dep. at 38, 65-66.)  Having a computer, Loye and Greeley exchanged email addresses and agreed to communicate by email.  (Greeley Dep. 73 and Ex. 2; Loye Dep. 175.)

Here there is a question of fact:  Loye maintains he and Gist requested an interpreter.  Greeley disagrees.  (Loye Dep. 173, Greeley Dep. 112-113.)  It is clear, however, that Loye and Greeley exchanged several emails over the next two weeks.  Not one of these emails either requests an interpreter, or indicates any lack of understanding.

Greeley told Loye she had scheduled a doctor's appointment for him.  Loye emailed an acknowledgment.  (Keena Aff. Ex. 19, 20.)  Greeley notified Loye that an interpreter would attend the September 15 group meeting.  (Keena Aff. Ex. 21.)  She made an appointment for Loye and Gist to select new carpet, and later reminded Loye of the appointment.  Loye emailed a confirmation.  He and Gist went to the appointment and selected new carpeting.  (Keena Aff. Ex. 22-25.)

Greeley met with Loye and Gist on September 14, 15, and 16.  At these meetings they exchanged written notes.  These covered getting food and clothing from the Rosemount Community Action Council ("CAC"), and Greeley's reminder to Loye of his upcoming doctor's appointment.  Greeley also delivered an emergency

assistance check from the Rosemount Lions Activity Fund.

On September 20, Greeley emailed Loye letting him know the
mercury level in the Loye/Gist home was now at safe levels and they
could return when the new carpet was installed. (Keena Aff. Ex.
26.) Loye's email response asked for details concerning the return
date. Greeley suggested a moving date, letting them know she would
stop by with written instructions. (Keena Aff. Ex. 27.) Loye
confirmed the meeting. (Keena Aff. Ex. 28.) Greeley met with Loye
and Gist on September 22, bringing the promised written
instructions, as well as contact information and financial
assistance forms. (Loye Aff. Ex. A; Greeley Dep. Ex. 2 at 7.)
Loye and Gist returned to their home on September 23.

On September 27, Loye emailed Greeley complaining the
television was not working, and of difficulty reaching Dakota
County's Economic Assistance office. Greeley emailed back asking
for details about the television, and giving further contact
information for both the Economic Assistance office and the CAC.
(Keena Aff. Exs. 29-30.) That same day, Greeley visited Loye and
Gist at home, again communicating by written notes. The next day,
September 28, Greeley sent Loye an email, letting him know she had
scheduled an appointment for him with the CAC the following
morning. Her email also advised Loye and Gist of documents they
should bring to the meeting. (Keena Aff. Ex. 31.)

From this recitation, the Court discerns no evidence of any

failure of effective communication on Greeley's part in dealing with Loye and Gist. Neither Loye nor Gist were injured in the mercury incident; Greeley's communications focused on housing and social and financial assistance. She obtained replacement prescriptions and checks, made appointments with a doctor and a decorator, and communicated when and where meetings were to occur. Her notes and testimony, supported by Loye's emails, clearly show Loye understood this information. No reasonable jury could find Loye and Gist were denied effective communication for failure to provide an ASL interpreter. Summary judgment is granted in this regard.

b. <u>Nurse Contacts With Marshall</u>

Marshall claims she met with Greeley eight times and no ASL interpreter was present for any of these meetings. (Marshall Aff. ¶ 7.) At several of these meetings, however, Marshall was accompanied by Beaman, who could hear. On these occasions, Greeley spoke to Beaman, whom she expected to convey the information to Marshall. (Marshall Aff. ¶ 8.)

At their first meeting, on September 8, Beaman and Marshall updated Greeley on Cassie's medical status. Greeley learned Cassie's blood and urine was being tested for mercury. Greeley agreed to pick up the urine specimen and deliver it to the hospital. She did so the next morning, talking briefly to Beaman during her visit. (Greeley Dep. 55-56 and Ex. 2.)

Later on September 9, Marshall learned she and Beaman were cleared to return home. (Marshall Aff. Ex. B at 2.) They did so the same day. MPCA employees were present and discussed proper cleaning. Marshall used written notes to communicate, but largely relied on Beaman to communicate with them. (Marshall Dep. at 117.)

On September 10, Greeley met with Marshall at the Eagan Community Center. Marshall told Greeley she lost her watch and engagement ring. Greeley told her to report the lost items to the MPCA. Marshall also advised Greeley she had thrown away some prescription medicine, and Cassie needed more shampoo. Greeley got the shampoo and delivered it to Marshall's home later that day. Greeley called Marshall's pharmacist, who agreed to refill the prescription. Greeley advised Beaman the pharmacist would call when the prescription was ready. (Greeley Dep. Ex. 2.)

On September 13, Greeley called the house telling Beaman Cassie's lab results might not be in until September 15. On the 15th, Greeley called again, asking if Cassie had gone to Regions Hospital for more blood testing. Beaman said Marshall preferred to take Cassie to her regular pediatrician for the test. Greeley scheduled a home visit for the following day.

On September 16, Greeley visited Marshall and Beaman at home. Greeley had intended to drop off a community resource list and was not accompanied by an interpreter. Beaman was home. Beaman and Marshall advised Greeley of Cassie's doctor's appointment later

that day.  Greeley told them to have the clinic call her with any questions.  Greeley's notes reflect Marshall asked about applying for emergency financial assistance.  Greeley agreed to call Beaman later and provide the contact information.  She called Beaman with the information the next day.  (Greeley Dep. Ex. 2.)

On September 20, Greeley called and again spoke to Beaman. She told him local service organizations had provided emergency funds for spill victims, and she would mail Beaman the release forms needed to obtain the funds.  Greeley received the completed release forms, forwarded them, and learned the Beaman/Marshall household received its checks shortly thereafter.

Nurse Greeley's next and last communication with Marshall occurred September 27.  She stopped by Marshall's home to visit and check in.  Marshall was upset.  Beaman was moving out.  Greeley gave Marshall another copy of the community resource list, highlighting the TTY (Telephone Typewriter) number for the County Crisis Response Unit.  Greeley also told Marshall Cassie's blood and urine tests reflected normal mercury levels.  Marshall, for her part, confirmed both she and Beaman got checks from the community service organizations.  Marshall advised Greeley she received paperwork and instructions on applying for emergency financial assistance, and she could fill out the forms.  This was a two-way series of communications, unaccompanied by an interpreter.

The Court finds Marshall received effective communication.  In

these cases Greeley either relayed information through Beaman, or relied on Marshall's lip-reading ability. As with Loye and Gist, the information Greeley conveyed was relatively simple - contact information, appointments, and the like. The sole piece of medical information exchanged was Cassie's normal test results.

Greeley effectively communicated with Marshall through Beaman. When the mercury release occurred, Marshall and her children had been living with Beaman and his son for nearly a year. (Marshall Dep. 16-17.) The evidence clearly establishes Marshall's reliance on Beaman as an intermediary in communicating during the emergency and its aftermath. (Marshall Dep. 45, 79, 91, 93-94, 117.) There is no indication that Marshall ever told Greeley, or anyone else, that communication through Beaman presented any problem.

Similarly, Marshall never indicated to Greeley she needed an interpreter to communicate. Marshall knew how to make such a request, having asked Jon Springsted for an interpreter on September 8. The record does not reflect a single request by Marshall for an interpreter at any of her meetings with Greeley. There is simply is no evidence from which a jury could find Marshall was unable to understand what was happening, or her questions were too complex to be addressed absent an interpreter.

For these reasons, the Court finds Marshall has failed to establish a prima facie case showing Greeley's communication with her was not effective, or that providing ASL interpreters was

reasonable to assure effective communications.  Summary judgment
for the County is proper.

Having ruled for the County on the merits, there is no need
for the Court to consider the County's arguments concerning
official immunity for claims under the MHRA.

### 4.  <u>Plaintiff Stiles</u>

The County has moved for sanctions against plaintiff David
Stiles.  The Court finds sanctions are appropriate.  When this
motion was argued, Stiles had moved to Washington state, had failed
to show up for his deposition,[18] and had offered no evidence
whatsoever in response to the County's properly-filed summary
judgment motion.

This case has been pending since early 2007.  Discovery closed
in November 2008.  Under Rule 56(e) of the Federal Rules of Civil
Procedure, Stiles was obliged to respond to the County's motion
for summary judgment with admissible evidence showing a genuine
issue of material fact which must be resolved at trial.   He has

---

[18]  Mr. Stiles' deposition was noticed for October 16, 2008.
The County scheduled two ASL interpreters for the deposition.  Mr.
Stiles chose not to return to Minnesota for his deposition.   His
counsel notified the County of this fact too late for it to avoid
paying the interpreters' fee required under the contract.   Under
these circumstances, it is appropriate to assess the interpreters'
fee of $1,050.00 to plaintiffs.

utterly failed to do so.[19]  There being no issue of material fact, summary judgment for the County is proper as to Stiles' claims.

III.  Conclusion

For the foregoing reasons, the Court grants summary judgment for defendant Dakota County as to all claims.

1.  Defendant's motion for summary judgment [Docket No. 34] is granted.

2.  Defendant's motion for sanctions [Docket No. 38] is granted.  Plaintiffs are directed to compensate defendant in the amount of $1,050.00, reflecting the costs for the interpreters provided for Mr. Stiles' deposition.

3.  Plaintiff's motion for leave to file a supplemental memorandum [Docket No. 60] is denied.

4.  Plaintiff's motion for leave to file the Affidavit of David Stiles [Docket No. 70] is denied.

---

[19]  Nearly five months after the summary judgment and sanctions motions were argued, David Stiles returned to Minnesota in August, 2009, and advised the Court, through counsel, that he is "willing and available" to have his deposition taken.  The Court rejects his untimely effort to rejoin and prolong this litigation, and denies leave to supplement the record.  In an on-the-record telephone conference, subsequent to Mr. Stiles' return, plaintiffs' counsel advised the Court the summary judgment motion could be decided on the basis of the materials supplied at the time it was heard.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 25, 2009


                              s/James M. Rosenbaum
                              JAMES M. ROSENBAUM
                              United States District Judge